**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

CLINTON W. ROGERS,

              Plaintiff,

vs.                                                                            Case No. 8:13-cv-2959-T-JRK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

              Defendant.
_____/

## **OPINION AND ORDER**[1]

### **I. Status**

Clinton W. Rogers ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits ("DIB"). Plaintiff's alleged inability to work is as result of "[m]ental illness[es]" including "schizoid effective" and obsessive compulsive disorder. Transcript of Administrative Proceedings (Doc. No. 11; "Tr." or "administrative transcript"), filed February 24, 2014, at 185. On July 30, 2010, Plaintiff filed an application for DIB, alleging an onset disability date of December 1, 2004.[2] Tr. at 137-38. Plaintiff's application was denied initially, see Tr. at 72, 74-77, and was denied upon reconsideration, see Tr. at 73, 79-81.

On May 22, 2012, an Administrative Law Judge ("ALJ") held a hearing, during which Plaintiff, who was represented by counsel; a vocational expert ("VE"); and Plaintiff's mother

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 15), filed May 13, 2014; Reference Order (Doc. No. 16), signed May 14, 2014 and entered May 15, 2014.

[2] The summary of the application for DIB is dated August 5, 2010, but it states that Plaintiff completed his application on July 30, 2010. Tr. at 137.

testified. Tr. at 40-71. The ALJ issued a Decision on June 13, 2012, finding Plaintiff not disabled through December 31, 2008, the date Plaintiff was last insured for DIB. Tr. at 24-32.

After the ALJ's Decision was issued, the Appeals Council received from Plaintiff, and incorporated into the administrative transcript, some additional evidence in the form of briefs from Plaintiff's representative. Tr. at 4-5; see Tr. at 233-35, 236-38. On September 27, 2013, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner. On November 21, 2013, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

Plaintiff advances four arguments on appeal. See Memorandum of Law (Doc. No. 19; "Pl.'s Mem."), filed June 2, 2014, at 13, 16, 18, 19. First, Plaintiff argues the ALJ "erred in failing to find a current severe head injury impairment" by "substituting his opinion for the opinion of the treating psychiatrist," and the ALJ correspondingly erred by "failing to include the effects of that severe impairment in the residual functional capacity [("RFC").]" Pl.'s Mem. at 13 (emphasis and capitalization omitted). Second, Plaintiff contends the ALJ erred in discounting the opinion of Hany Mikhail Botros, M.D., Plaintiff's treating psychiatrist. Id. at 16. Third, Plaintiff asserts the ALJ erred in relying on an opinion of a non-examining psychologist who took into account evidence that is not contained in the administrative transcript. Id. at 18-19. Fourth, Plaintiff argues the ALJ erred in the "evaluation of [his] symptoms and credibility," including in evaluating the credibility and statements of Plaintiff's mother. Id. at 19-20 (emphasis and capitalization omitted). On August 29, 2014, Defendant

filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 21; "Def.'s Mem.") responding to Plaintiff's arguments. After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned determines that the Commissioner's final decision is due to be reversed and remanded for further proceedings.

## II.  The ALJ's Decision

When determining whether an individual is disabled,[3] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the sequential inquiry through step four, where he ended the inquiry based upon his finding at that step. See Tr. at 26-32. At step one, the ALJ determined that Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of December 1, 2004 through his date last insured of December 31, 2008." Tr. at 26 (emphasis and citation omitted). At step two, the ALJ found that "[t]hrough

---

[3] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

-3-

the date last insured, [Plaintiff] had the following severe impairments: history of schizoaffective disorder and obsessive-compulsive disorder, well controlled with medication; obesity; and a remote head concussion in 1994 with no clinically identified residual." Tr. at 26 (emphasis and citation omitted). At step three, the ALJ ascertained that "through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. at 27 (emphasis and citation omitted).

> The ALJ determined that through the date last insured, Plaintiff had the following RFC:
>
> [Plaintiff could] perform medium work as defined in 20 CFR [§] 404.1567(c), such that [Plaintiff] is able to lift and carry up to fifty pounds occasionally and twenty five pounds frequently; is able to stand and walk for a total of about six hours; is able to sit for up to six hours in an 8-hour work-day, with normal breaks; he is able to occasionally operate foot controls; is unable to climb ropes or scaffolds, but can occasionally climb ladders; he is able to frequently climb ramps and stairs; he is able to frequently balance, stoop, kneel, crouch, and crawl; he should avoid concentrated exposure to environmental irritants such as fumes, odors, dust, gases, or poorly ventilated areas; must avoid even moderate exposure to hazards such as the use of moving machinery or unprotected heights; retains the ability to understand, remember, and carry out simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements; and [Plaintiff] is able to have only occasional or superficial interaction with the general public.

Tr. at 28-29 (emphasis omitted). At step four, the ALJ found that "[t]hrough the date last insured, [Plaintiff] was capable of performing past relevant work as a warehouse worker/order clerk" because "this work did not require the performance of work related activities precluded by [Plaintiff's RFC]." Tr. at 32 (emphasis and citation omitted). The ALJ concluded that Plaintiff "was not under a disability . . . at any time from December 1, 2004, the alleged onset date, through December 31, 2008, the date last insured." Tr. at 32 (emphasis and citation omitted).

### III.  Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence."  Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

### IV.  Discussion

The undersigned addresses the arguments relating to the medical opinions of record (the second and third arguments) and concludes that reversal and remand is necessary for further consideration of those opinions.  Given this conclusion, and given that

reconsideration of the evidence in light of the Court's overall findings is likely to impact the findings at which Plaintiff's remaining arguments on appeal are aimed, it is unnecessary to substantively address Plaintiff's remaining arguments. See Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be reconsidered on remand); Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues). A discussion follows.

**A. Relevant History**

Plaintiff was hospitalized related to his psychiatric issues at last three times prior to the date last insured, all three of which appear to have occurred after the alleged onset date of December 1, 2004: once involuntarily on December 3, 2004 (days after the alleged onset date); see Tr. at 284-88; once involuntarily pursuant to a court order in March 2005, see Tr. at 222-26; and once in January 2007, see Tr. at 244-45.

During the December 2004 admission, Plaintiff denied having "'any problems'" and believed it was a "'misunderstanding'" that he had been admitted for a psychiatric assessment. Tr. at 284 (quoting Plaintiff). Plaintiff's mother, with whom he lived, reported that Plaintiff was "paranoid"; "thought his grandfather was on a government secret mission and he felt that his grandfather was communicating to him via the computer"; and had been talking to himself. Tr. at 284. As far as Plaintiff's job history, "[h]e was working in November and apparently had some trouble concentrating." Tr. at 285. Plaintiff's family members reported that he had difficulty "holding a job." Tr. at 285.

During a January 12, 2005 followup interview with a psychiatrist, Plaintiff was guarded; he did not know the correct date; he was not able to count backward by serial threes; his insight was poor; his judgment was fair; and his prognosis was poor. Tr. at 286, 288. "[A]t th[e] time," Plaintiff "ha[d] no insight into his illness." Tr. at 288. Plaintiff was "not willing to try any psychiatric medication at all and he d[id] not want a follow-up appointment" with the psychologist. Tr. at 288. Plaintiff was diagnosed with "[h]istory of psychotic disorder NOS, rule out schizophrenia versus schizoaffective disorder, history of alcohol abuse." Tr. at 287.

Records from the March 2005 hospitalization are not in the administrative transcript, but Plaintiff's mother's petition for an involuntary hospitalization and the ex parte court order authorizing it are. Tr. at 222-26. In the application, Plaintiff's mother details the behavior that Plaintiff was engaging in that caused her to seek the involuntary hospitalization, including continued paranoia; continued delusions about his grandfather; continued refusal to take medication; continued talking to himself; continued denial of psychiatric problems; and inability to interact with anyone or to work. Tr. at 224-25.

The next hospitalization was in January 2007. See Tr. at 244. Dr. Botros was the consulting psychiatrist. Tr. at 244-45. Plaintiff was admitted to the hospital and diagnosed with cellulitis because had been standing "in the same place without moving for the last 72 hours," Tr. at 242, in a "catatonic[-]type" state, Tr. at 240. Prior to the admission, Plaintiff had been talking to himself; had not had anything to eat or drink in two days; and was exhausted and had not slept in three days. Tr. at 244. Plaintiff lived with his mother, who served as the main historian when Plaintiff was admitted. Tr. at 240-44. Plaintiff's mother

reported that Plaintiff "ha[d] a history of psychiatric illness for the last 3 years," but Plaintiff "ha[d] never had psychiatric problems that were this severe before[.]" Tr. at 242. Upon admission, Plaintiff refused to interact with treating doctors. Tr. at 242. He appeared to be "responding to internal stimuli," Tr. at 242, despite that same day denying to Dr. Botros having "auditory or visual hallucinations," Tr. at 244.

Prior to admission, Plaintiff had refused to take any medications. Tr. at 244. During the consult with Dr. Botros, Plaintiff agreed to start taking an antipsychotic, which Dr. Botros prescribed. Tr. at 244-45. Dr. Botros diagnosed "[m]ajor depressive disorder, severe, with psychotic features, obsessive-compulsive disorder by history, and consider mental disorder, secondary to organic brain syndrome, namely brain concussion, secondary to [a] motor vehicle accident" that had occurred in 1997. Tr. at 245. Dr. Botros also "recommend[ed that Plaintiff] have [a] brain MRI with and without contrast to be done to rule out any remaining brain lesion from brain concussions that he suffered in 1997." Tr. at 245. The MRI showed "encephalomalacia[4] most likely due to old infarct in the right temporal lobe." Tr. at 246 (emphasis and capitalization omitted).

After the January 2007 hospitalization, Dr. Botros saw Plaintiff fairly regularly for treatment and followup through at least October 2011. See Tr. at 266-83, 344-47. Plaintiff was escorted by his mother almost every visit. See id. Similar to Dr. Botros's initial impressions, the diagnosis was "[m]ental disorder, secondary to organic brain syndrome namely, brain concussion secondary to motor vehicle accident and obsessive-compulsive disorder by history." Tr. at 282. Generally speaking, Plaintiff and his mother reported that

---

[4] Encephalomalacia is a softening of the brain tissue.

Plaintiff was compliant with the prescribed medications, was doing well on the medications, and had no side effects.  See Tr. at 267-83, 344-35.  Plaintiff was advised by Dr. Botros not to drive or operate machinery while taking the medications.  See, e.g., Tr. at 282, 281.

**B. Opinions at Issue**

    **1. Dr. Botros (treating psychiatrist)**

On June 7, 2011, Dr. Botros authored an opinion on a form entitled, "§ 8:65 Medical statement concerning organic brain syndrome for Social Security disability claim[.]"  Tr. at 335-38.  According to Dr. Botros, Plaintiff suffered from memory impairment; perceptual or thinking disturbances; change in personality; disturbance in mood; emotional lability; and impairment in impulse control.  Tr. at 335.  Dr. Botros opined Plaintiff had marked restrictions in activities of daily living; extreme difficulties in maintaining social functioning; difficulties in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; repeated episodes of decompensation; a medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate; and a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  Tr. at 335-36.  Dr. Botros also opined Plaintiff was markedly impaired in his ability to perform a number of work-related

functions, and extremely impaired in yet more areas. Tr. at 336-38. In the comments section of the form, Dr. Botros wrote:

> [Plaintiff] suffers severe mental disorder that makes him unable to interact appropriately with others, can't tolerate job-related stress, feels paranoid, suspicious [and] scared of people, hallucinating, hearing voices, has short attention span, poor focusing, poor memory, can't accept criticism from others, doesn't always deal with reality.

Tr. at 338.

### 2. Dr. Bee (non-examining psychologist)

On November 8, 2010, Dr. Bee authored an opinion in which she opined Plaintiff was not significantly limited in most areas of work-related functioning and moderately limited in a handful of areas. Tr. at 323-34. Dr. Bee summarized the medical evidence of record, as well as activities of daily living that were contained in a "prior application file in 2007[.]" Tr. at 321. According to Dr. Bee,

> [I]t appears that [Plaintiff's] condition has generally been amenable to good control and stability with benefit of medications. There is little social involvement beyond family, but he is able to relate to people in public and his interaction is appropriate when stable on medication. Performs various house and yard tasks on a regular basis. Residual impairment does not appear to meet or equal a listing.

Tr. at 321. Dr. Bee assigned moderate restriction in activities of daily living; mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and three episodes of decompensation, each of extended duration. Tr. at 319.

**C. Applicable Law**

The Regulations establish a "hierarchy" among medical opinions[5] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); see also 20 C.F.R. §§ 404.1527(e), 416.927(e).

With regard to a treating physician or psychiatrist,[6] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c). Because treating physicians or psychiatrists "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's

---

[5] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources").

[6] A treating physician or psychiatrist is a physician or psychiatrist who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

or psychiatrist's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Id.  When a treating physician's or psychiatrist's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician or psychiatrist should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's or psychiatrist's own medical records. Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing

Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)). However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); see also Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440. "'In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" Winschel, 631 F.3d at 1179 (quoting Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)).

**D. Analysis**

The ALJ assigned "little weight" to the opinion of treating psychiatrist Dr. Botros and assigned "greater weight" to the opinions of the non-examining state agency consultants, including Dr. Bee. Tr. at 31. The ALJ's reasons for doing so were as follows:

> I acknowledge that a treating physician's medical opinion of the nature and severity of a claimant's impairment is normally given controlling weight if it is well supported and not inconsistent with other substantial evidence in the case record. However, it may be discounted if it is inconsistent with the evidence

> and record as a whole, and is unsupported by the evidence. Dr. Botros['s] opinion is not supported by any treatment notes or the results of clinical or diagnostic testing, and is inconsistent with the evidence as a whole. Here, Dr. Botros['s] own treatment notes repeatedly indicated that [Plaintiff] reported doing very well on medi[c]ation, with no side effects. Further, [Plaintiff] reported good and stable mood with good sleep at night. In addition, this opinion was rendered several years after [Plaintiff's] date last insured, and does not indicate that these limitations were applicable during the relevant period. For these reasons, I give the opinion of Dr. Botros little weight.
>
> The opinions of the non-examining State agency medical consultants are given greater weight as they are consistent with the evidence as a whole. The [RFC] conclusions reached by the physicians employed by the State Disability Determination Services also support a finding of ["]not disabled[."] Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision).

Tr. at 31 (citations omitted).

The ALJ erred in assigning little weight to Dr. Botros's opinion. The ALJ's reasoning rests on the faulty assumption that Plaintiff did not have the severe psychiatric problems during the relevant time period and prior to the good response to medication. The ALJ first stated that the opinion "is not supported by <u>any</u> treatment notes or by the results of clinical or diagnostic testing," Tr. at 31 (emphasis added),[7] when in fact, Dr. Botros's opinion is well supported by his notes from the January 2007 hospitalization. Yet, the ALJ focused on Dr. Botros's treatment notes from visits after the hospitalizations documenting good response to the prescribed medication and no side effects, many of which were authored after the date last insured. There is no real dispute that after Plaintiff became medicated in January 2007

---

[7] Defendant, too, urges that Dr. Botros's notes overall do not support the extreme limitations he imposed. See Def.'s Mem. at 11-13.

and after he began regularly taking the medication, his condition improved to a degree. See Tr. at 59 (Plaintiff's mother testifying that Plaintiff is "better" on medication). But prior to that, for a number of years during the relevant time period, Plaintiff's mental issues were severe and untreated.[8]

The ALJ then recognized that the opinion was authored "several years" after the date last insured and observed that it "does not indicate that these limitations were applicable during the relevant period." Tr. at 31. While Dr. Botros did not explicitly indicate this, it is clear from the administrative transcript that Plaintiff's condition between 2004 and 2007 (most of the relevant time period) was dire; it was not until after his January 2007 hospitalization and after he started taking medication that his condition improved. And further, Dr. Botros explicitly opined that Plaintiff's condition had lasted "at least 2 years" without indicating exactly how long. Tr. at 336. Reading this together with the rest of the administrative transcript, including Dr. Botros's initial impressions in 2007, it is easily inferred that Dr. Botros was speaking about the relevant time period.

The ALJ also erred in assessing the opinion of Dr. Bee. The ALJ indicated that he was assigning "greater weight" to her opinion, Tr. at 31, but he completely rejected the opinion that Plaintiff had three major episodes of decompensation of extended duration without stating the basis for this rejection, see Tr. at 28. In finding Plaintiff had "no episodes of decompensation, which have been of extended duration," the ALJ stated (inaccurately) that "[t]here is little in the record that would indicate that [Plaintiff] has suffered from any

---

[8] The mental issues went untreated because Plaintiff did not believe he had any issues; a belief not uncommon for individuals with serious mental illnesses.

episodes of decompensation from the alleged onset date through the date last insured." Tr. at 28. Yet, the ALJ did not discuss Dr. Bee's opinion to the contrary, and upon which he purportedly relied later in the Decision. See Tr. at 28. Further, Dr. Bee relied at least in part on evidence of Plaintiff's activities of daily living that is not included in the administrative transcript and may have been submitted to the administration prior to Plaintiff's severe psychiatric decline. Because the evidence is not in the administrative transcript, however, it is not possible to tell for sure.

For all of the foregoing reasons, remand is necessary for the ALJ to reconsider the opinions of Dr. Botros and Dr. Bee.

## V. Conclusion

After due consideration, it is

**ORDERED**:

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

   (A) Reevaluate the opinions of Dr. Botros and Dr. Bee;

   (B) If appropriate, address the other issues raised by Plaintiff in this appeal; and

   (C) Take such other action as may be necessary to resolve this matter properly.

2. The Clerk is further directed to close the file.

3. In the event benefits are awarded on remand, Plaintiff's counsel shall ensure that any § 406(b) fee application be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on March 17, 2015.

*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of record